UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ADHAM HASSOUN,

                                               Petitioner,

                                                                                                          Case # 18-CV-586-FPG

v.

                                                                                                          DECISION AND ORDER

MR. JEFF SESSIONS, Attorney General of
the United States, et al.,

                                              Respondents.

## INTRODUCTION

Petitioner Adham Hassoun, a civil immigration detainee detained at the Buffalo Federal Detention Facility, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. ECF No. 3. He claims that he has been in U.S. Immigration and Customs Enforcement ("ICE") custody beyond the statutory removal period and that his detention violates his constitutional rights. *See id.* The parties have fully briefed the issues raised in the petition. In addition, the New York Civil Liberties Union Foundation ("NYCLU") has filed a brief as *amicus curiae* to alert the Court to certain important legal questions. Having reviewed the record and the briefing, the Court finds that a hearing is unnecessary to resolve the petition. For the reasons that follow, the petition is GRANTED.

## BACKGROUND

The following facts are drawn from the record. Petitioner is a Palestinian who, while born in Lebanon, is not a citizen of Lebanon. Petitioner was first admitted to the United States in 1989 as a nonimmigrant "visitor for pleasure," which was changed in 1990 to that of a nonimmigrant student. ECF No. 13-1 at 2. In 2002, after Petitioner failed to comply with the conditions of his

1

student visa, immigration authorities detained him and instituted removal proceedings. *See* 8 U.S.C. § 1227(a)(1)(C)(i) (stating that an alien who fails to comply with the conditions of nonimmigrant status is deportable). Petitioner's order of removal became administratively final in 2003.

In early 2004, before Petitioner could be removed, he was taken into federal custody on criminal charges. Ultimately, Petitioner was convicted on three charges: (1) conspiracy to murder, kidnap and maim persons in a foreign country (18 U.S.C. § 956(a)(1)); (2) conspiracy to provide material support for terrorism (18 U.S.C. § 371); and (3) providing material support to terrorists (18 U.S.C. § 2339A(a)). *See* ECF No. 13-1 at 3. Petitioner completed his term of imprisonment in October 2017, at which time he was again detained by immigration authorities on his original order of removal. ICE began "engag[ing] with multiple foreign governments concerning [Petitioner's] removal." *Id.*

Petitioner has remained in custody at the Buffalo Federal Detention Facility since October 2017. At present, Respondents do not justify Petitioner's continued detention on the basis of his criminal convictions or his threat to the community. *See* ECF No. 14 at 6-7. Instead, Petitioner is being detained because he failed to comply with the conditions of his nonimmigrant status and because, in Respondents' view, his removal is likely to occur in the reasonably foreseeable future. *See id.*; ECF No. 29-13; *see also* 8 U.S.C. § 1231(a)(6) (permitting detention of aliens who are removable for failure to comply with conditions of nonimmigrant status).

In May 2018, Petitioner filed the present petition, challenging his continued detention and arguing that it was unlikely that he would be removed in the reasonably foreseeable future. *See* ECF No. 1.

Around the time the petition was filed, immigration authorities were seeking to remove Petitioner to the territory of the West Bank. That avenue appeared to be promising. In June 2018, the Palestinian Liberation Organization ("PLO")—through its representatives located in Washington, D.C.—notified ICE that it would be willing to issue travel documents to Petitioner to enter the West Bank. However, removal to the West Bank requires transit through, and therefore authorization from, Jordan and Israel. *See* ECF No. 45-1 at 2. Alternatively, the PLO indicated that it would issue Petitioner a passport if another country agreed to accept him.

By late July 2018, immigration authorities had submitted a request to Israel for authorization. In addition, travel-document requests had been submitted to "the Governments of Egypt, Iraq, Israel, Lebanon, the Palestinian Territories, Somalia, Sweden, and the United Arab Emirates." ECF No. 13-1 at 3. Saudi Arabia was also approached. ECF No. 45-1 at 2. In a declaration dated July 27, 2018, Michael Bernacke, Unit Chief for Removal and International Operations at ICE, opined that Petitioner's removal was "significantly likely in the reasonably foreseeable future." ECF No. 13-1 at 4.

Obstacles have since arisen that complicate Petitioner's removal to the West Bank. In September 2018, the PLO's Washington, D.C. office was closed, potentially casting some doubt as to whether ICE could still obtain travel documents. Nevertheless, ICE indicates that it has "continued to engage directly with Palestinian Authority officials in the West Bank for travel documents in numerous cases" and that there is "no indication that the Palestinian Authority considers the decision of the [Washington] PLO delegation concerning [Petitioner's] travel documents to be invalid." ECF No. 45-1 at 2. Furthermore, in November 2018, Jordan unilaterally terminated the "Memorandum of Coordination" under which it arranged Palestinian deportations with ICE. A new Memorandum of Coordination is being negotiated with Jordan, but Respondents

3

provide no timeline for when those negotiations would be complete, let alone for when Petitioner could obtain travel authorization. The request for authorization from Israel remains pending, and Respondents offer no timeline or update as to the status of that request.

Furthermore, Sweden, the United Arab Emirates, Iraq, and Lebanon have declined ICE's travel-document requests. ECF No. 15-1 at 2; ECF No. 45 at 3. The requests to the other governments are apparently pending without any new developments.

To remove Petitioner, ICE has also sought the assistance of an interagency working group consisting of various government entities, including the Department of State. In Fall 2018, the State Department identified several countries that might accept Petitioner. In particular, there is one unspecified country that the State Department believes is "most likely to consider seriously a U.S. request" to accept Petitioner. ECF No. 45-2 at 4. There are delicate diplomatic considerations in play, however. These considerations are set forth in the declaration of Hillary Johnson, a deputy coordinator with the Department of State. *See id.* at 2.

For one thing, to maximize the likelihood of success, "the U.S. government would need to make the request of that one country alone and not concurrently with requests to other nations. This is because the country would need to engage in a comprehensive decision-making process in order to accept [Petitioner]." *Id.* at 4. In addition, the country would need to remain anonymous during this process. *Id.* at 5. Johnson avers that on November 28, 2018, the State Department issued an official "Démarche" cable to the U.S. Embassy in the unspecified country, "instructing the Embassy to contact the domestic government at the highest appropriate level."[1] *Id.* at 4. On December 6, 2018, "[t]he U.S. Ambassador personally presented the request that the country accept [Petitioner's] removal to a high-ranking official in the Ministry of Foreign Affairs." *Id.* at

---

[1] "A Démarche is an official government-to-government request made in diplomatic channels, and is reserved for the most serious or formal communications between states." ECF No. 45-2 at 4-5.

5. That official "agreed to give the request serious consideration, and to discuss the U.S. request with others across his government." *Id.* Respondents offer no particular timeline in which removal could be effectuated to the unspecified country, but Johnson indicates that the State Department "hope[s] to have some response to [the] request by mid-January." *Id.* There are two other countries to which the State Department may send requests if the "present, positive, assessment of the likelihood of removal to the [unspecified] country . . . change[s]." *Id.*

## DISCUSSION

Petitioner requests release from custody on the ground that there is no significant likelihood that he will be removed in the reasonably foreseeable future. He raises three claims: (1) that his continued detention violates 8 U.S.C. § 1231(a)(6); (2) that his continued detention violates his substantive due process rights; and (3) that ICE's administrative review of his custody status is so deficient as to violate his procedural due process rights. The Court first addresses Petitioner's statutory claim.

### I. Petitioner's First Claim – Violation of 8 U.S.C. § 1231(a)(6)

#### a. Legal Standard

The Court begins by providing some background on the statutory scheme governing the detention of aliens who have been ordered removed. Under 8 U.S.C. § 1231(a)(1)(A), "aliens ordered removed shall be removed by the Attorney General within [a] 90-day 'removal period.'" *Turkmen v. Ashcroft*, 589 F.3d 542, 547 (2d Cir. 2009). "The government is required to detain an alien ordered removed until removal is effected, at least for the removal period." *Id.* (citing 8 U.S.C. § 1231(a)(2)). If removal is not effectuated within the removal period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3).

5

In addition, there is a "special statute [that] authorizes further detention if the Government fails to remove the alien" during the removal period. *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). Specifically, 8 U.S.C. § 1231(a)(6) gives the government the discretion to detain certain categories of aliens:

> An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision . . . .

*Id.* (quoting 8 U.S.C. § 1231(a)(6)). By its plain language, the statute does not appear to impose any limitation on the length of an alien's detention. But in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court interpreted § 1231(a)(6) narrowly to avoid the possible constitutional problems with indefinite detention. It read the statute to impose certain implicit limitations on the government's authority to detain aliens falling into those categories. The court held that an alien could be detained "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. This limitation is linked to the statute's "basic purpose," which is to "assur[e] the alien's presence at the moment of removal." *Id.* at 699.

The *Zadvydas* court also provided a framework under which habeas courts are to review claims challenging continued detention under § 1231(a)(6). The ultimate question for the habeas court is "whether the detention in question exceeds a period reasonably necessary to secure removal." *Id.* The presumptively reasonable period of detention is six months. *Id.* at 701. Once that period has passed, an alien bringing a claim bears the initial burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If the alien makes such a showing, "the [g]overnment must respond with evidence sufficient to rebut that showing." *Id.*

In analyzing the likelihood of removal, courts consider a variety of factors, including the existence of a repatriation agreement with the target country, the target country's prior record of accepting removed aliens, and specific assurances from the target country regarding its willingness to accept an alien. *Callender v. Shanahan*, 281 F. Supp. 3d 428, 436-37 (S.D.N.Y. 2017); *see also Nma v. Ridge*, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003). Due deference is owed to the government's views on these matters as well as its estimation of the likelihood of removal. *See Zadvydas*, 533 U.S. at 700 (stating that review "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive . . . efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters").

What constitutes the "reasonably foreseeable future" will depend on the length of detention. That is, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Zadvydas*, 533 U.S. at 701. In effect, the parties' respective burdens shift as the length of detention increases. *See, e.g.*, *Alexander v. Attorney General U.S.*, 495 F. App'x 274, 276-77 (3d Cir. 2012) ("*Zadvydas* . . . suggests that an inversely proportional relationship is at play: the longer an alien is detained, the less he must put forward to obtain relief."); *D'Alessandro v. Mukasey*, 628 F. Supp. 2d 368, 406 (W.D.N.Y. 2009); *Lawrikow v. Kollus*, No. CV-08-1403, 2009 WL 2905549, at *12 (D. Ariz. July 27, 2009); *Shefqet v. Ashcroft*, No. 02 C 7737, 2003 WL 1964290, at *4 (N.D. Ill. Apr. 28, 2003). Thus, as time passes, the mere existence of possible avenues for removal becomes insufficient to justify further detention; some evidence of progress is required. *See Elashi v. Sabol*, 714 F. Supp. 2d 502, 506 (M.D. Pa. 2010); *Lawrikow*, 2009 WL 2905549, at *13; *Hajbeh v. Loiselle*, 490 F. Supp. 2d 689, 693 (E.D. Va. 2007); *Shefqet*, 2003 WL 1964290, at *5. *But see Gathiru v. Banieke*,

No. 15-CV-4247, 2016 WL 8671833, at *6 (D. Minn. Sept. 9, 2016) (noting that the mere "lack of visible progress" or the government's inability to provide a concrete timeframe for removal does not necessarily establish that removal is unlikely in the reasonably foreseeable future).

### b. Analysis

Petitioner has surmounted the first of *Zadvydas*'s hurdles, as it is undisputed that the six-month presumptively reasonable period has passed. *See Zadvydas*, 533 U.S. at 701. Indeed, Petitioner has been detained at the Buffalo Federal Detention Facility since October 2017—more than fourteen months.

Having established that his detention has extended beyond the presumptively reasonable period, Petitioner bears the initial burden to provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* The Court concludes that he has met this burden.[2] Petitioner has shown that the countries with which he has any affiliation will not accept him. Lebanon, his place of birth, will not accept him. ECF No. 29-20 at 2. Neither Sweden nor the United Arab Emirates, where he has family, will accept him. *See* ECF No. 29-1 at 2. While the PLO is willing to admit Petitioner to the West Bank, his authorization from Israel has been pending since at least July 2018 without update, and any authorization from Jordan is now stalled as a new Memorandum of Coordination is negotiated. Furthermore, Petitioner has submitted a declaration from Ardi Imseis, an assistant professor of law at Queen's University, who has significant experience in the area of Palestinian refugees. *See* ECF No. 29-3 at 1. Imseis opines that it is "extremely unlikely" that Israel will allow Petitioner to enter

---

[2] The NYCLU argues that the Court should take this opportunity to clarify *Zadvydas*'s "good reason" standard. The NYCLU contends that "good reason" should be considered a "relatively low threshold," and it disapproves of decisions in this district that have held aliens to a higher burden. ECF No. 37 at 7-12. The Court does not consider it necessary to do so. Petitioner has provided sufficient evidence to show that his removal is not significantly likely in the reasonably foreseeable future. Whether the "good reason" standard demands a low or high evidentiary showing, Petitioner has satisfied it in this case.

the West Bank. *Id.* at 6. Furthermore, it is undisputed that Petitioner has actively assisted the government in its efforts to obtain his removal. *See* ECF No. 14 at 9-10. The evidence Petitioner presented goes far beyond the sorts of conclusory statements and general assertions that courts have found insufficient to satisfy the initial burden. *See, e.g.*, *Beckford v. Lynch*, 168 F. Supp. 3d 533, 539-40 (W.D.N.Y. 2016) (collecting cases). By any reasonable measure, Petitioner has provided "good reason" to believe that he will not be removed in the reasonably foreseeable future.

Consequently, the burden shifts to Respondents to rebut Petitioner's showing. *Zadvydas*, 533 U.S. at 701. Respondents have provided a variety of evidence in support of their position. Even so, after reviewing Respondents' evidence and the record as a whole, the Court concludes that there is no significant likelihood of removal in the reasonably foreseeable future.

It is important to note at the outset that this is not a case where the government has been dilatory in its attempts to effectuate removal. To the contrary, the record establishes that the government has undertaken substantial, good faith efforts to remove Petitioner. Immigration authorities have contacted a number of countries, engaged multiple government agencies, and undertaken high-level diplomatic efforts. But, under *Zadvydas*, the reasonableness of Petitioner's detention does not turn on the degree of the government's good faith efforts. Indeed, the *Zadvydas* court explicitly rejected such a standard. *See id.* at 702. Rather, the reasonableness of Petitioner's detention turns on whether and to what extent the government's efforts are likely to bear fruit. Diligent efforts alone will not support continued detention.

It is likewise important to note that, in this case, the length of Petitioner's detention is a critical factor in the calculus. As discussed above, the government's burden becomes more onerous the longer an alien is detained, because it must show that removal will be effectuated sooner in the future. *See, e.g.*, *D'Alessandro*, 628 F. Supp. 2d at 406 ("Given the [16-month]

detention . . . the reasonably foreseeable future has nearly shrunk to the point of being the present time."); *Shefqet*, 2003 WL 1964290, at *4 ("The period of Petitioner's post-final-order detention has at this time exceeded seventeen months and so the 'reasonably foreseeable future' must now come very quickly.").

Respondents have not carried that burden. From what the Court can gather, there remain the following possible options: Somalia, Saudi Arabia, Egypt, Israel, the Palestinian territories, and the unspecified country.[3] As to the first four countries, travel document requests have been pending since at least late July 2018—about five months—and Respondents have not elaborated on the status or likelihood of success of those requests. Respondents' assertions are more general and vague. Bernacke states that Somalia and Saudi Arabia have shown a past "willingness to assist in third-country removal for individuals in other cases." ECF No. 45-1 at 2. Bernacke also states that he has discussed Petitioner's removal "with high level foreign government representatives." ECF No. 13-1 at 3. But the record does not disclose that any of these countries—Somalia, Saudi Arabia, Egypt, or Israel—have meaningfully responded to the government's request.[4] *See Khader v. Holder*, 843 F. Supp. 2d 1202, 1208 (N.D. Ala. 2011) (fact that travel-document request—which had been pending for eight months without update—had not been denied was insufficient to show significant likelihood of removal in the reasonably foreseeable future); *see also Nma*, 286 F. Supp. 2d at 475. Nor does Bernacke offer any specific opinion as to whether removal is likely to any of

---

[3] There are also two other unspecified countries to which the State Department may reach out, but it has yet to do so. *See* ECF No. 45-2 at 5.

[4] Some courts have held that "mere delay by the foreign government in issuing travel documents, despite reasonable efforts by United States authorities to secure them," does not demonstrate "that there is no significant likelihood of removal in the reasonably foreseeable future." *Boachie-Danquah v. U.S. Attorney General*, No. 17-cv-641, 2018 WL 868769, at *3 (S.D. Ohio Feb. 14, 2018) (collecting cases). The present case is distinguishable. The record does not indicate that the delay in Petitioner's case is the result of bureaucratic inertia from an otherwise amenable country.

these countries or what the timeframe might be. Particularly given that Petitioner does not have any connection to these countries, removal to one of them constitutes, at most, an "unsubstantiated possibility" as opposed to a concrete likelihood. *Lawrikow*, 2009 WL 2905549, at *13. Because the reasonably foreseeable future is drawing nearer, more is required from the government.

Petitioner's possible removal to the Palestinian territories suffers from the same defect. To be sure, there is evidence that Palestinian authorities are willing to accept Petitioner. But removal to the West Bank also requires authorization from Jordan and Israel. ECF No. 45-1 at 2. Jordan has unilaterally terminated its Memorandum of Coordination with ICE, and Respondents offer no timeframe in which removals might begin again. Even assuming that a new Memorandum of Coordination will be negotiated expeditiously, Respondents present no evidence as to (1) the likelihood that the Jordanian government will authorize Petitioner's transit to the West Bank, or (2) how long it would take the Jordanian government to provide such authorization. Respondents' showing with respect to Israel's authorization is similarly lacking—the only evidence is that the request "remains pending with Israeli authorities." *Id.* The combination of diplomatic barriers to Petitioner's removal and the absence of a meaningful response from Jordan and Israel leave the Court skeptical that there remains a significant likelihood that Petitioner will be removed to the West Bank in any timeframe that might be described as reasonably foreseeable.

The final possibility is the unspecified country to which the government has recently reached out. Respondents present some evidence that this country might be viable. A high-ranking official of that country agreed to "give the request serious consideration" and to discuss it with others in his government. ECF No. 45-2 at 5. More generally, Bernacke opines that high-level negotiation by "senior levels of ICE management and embassy staff" generally results "in positive outcomes." ECF No. 13-1 at 3. Similarly, Johnson opines that the State Department has

11

successfully resolved cases similar to Petitioner's in the past through diplomatic channels.  ECF No. 45-2 at 3.  However, the record fails to disclose any evidence illuminating the likelihood that this country will accept Petitioner specifically or the timeframe in which removal could be effected.  The Court recognizes that such information may not be presently available, given the preliminary stage of the request and the delicacy of the negotiations, but that merely reinforces the Court's view that Respondents have not shown that Petitioner will likely be removed in the reasonably foreseeable future.

As Respondents note, under *Zadvydas*, a habeas court must take into account the "greater immigration-related expertise of the Executive Branch."  *Zadvydas*, 533 U.S. at 700.  In this case, such deference may warrant crediting the government's view that, despite the apparent barriers and diplomatic hurdles it faces, it will ultimately "obtain the approval necessary to remove Petitioner either to the West Bank or a third country."  ECF No. 45 at 8.  But detention may not be justified on the basis that removal to a particular country is likely *at some point* in the future; *Zadvydas* permits continued detention only insofar as removal is likely in the *reasonably foreseeable* future.  *Zadvydas*, 533 U.S. at 701.  At fourteen months of detention, Petitioner's removal need not necessarily be imminent, but it cannot be speculative.  *See Shefqet*, 2003 WL 1964290, at *6 (concluding that, after seventeen months of detention, "Petitioner's period of post-final-order detention has been sufficiently long such that a remote, non-specific possibility does not satisfy Respondents' burden").  And while the Court understands that Petitioner's circumstances and criminal history present unique difficulties, a finding in the government's favor would at this stage be founded merely upon the extent of the government's efforts, rather than the likelihood of removal in the foreseeable future.  *Zadvydas* demands more.  *See Zadvydas*, 533 U.S. at 702.

Accordingly, because the Court cannot conclude that there is a significant likelihood of removal in the reasonably foreseeable future, Petitioner's continued detention is no longer authorized under § 1231(a)(6).

Two matters give the Court some pause. First, Johnson indicates that the State Department "hope[s] to have" a response from the unspecified country by mid-January. ECF No. 45-2 at 5. It is unclear whether this means that the country might definitively approve Petitioner's removal by mid-January, or simply that the country will notify the State Department that it is willing to begin a formal authorization process at that time. Regardless, in light of the ongoing negotiations and the State Department's view that the unspecified country represents one of the strongest options for Petitioner's removal, the Court intends to give the government reasonable leeway in pursuing that possibility.

Therefore, the Court will delay Petitioner's release until March 1, 2019. On or before January 28, 2019, the government may file a supplemental memorandum detailing the state of negotiations with the unspecified country. The government's memorandum shall be limited to that issue, and no further briefing by any party will be permitted without prior leave of Court. Based on the information provided by the government, the Court will determine whether to further delay Petitioner's release and stay its order.

Second, Petitioner stands convicted of serious federal offenses relating to terrorist activities. Despite this, Petitioner is not presently being detained on the basis that he presents a risk to the community, which would be an independent reason justifying his continued detention. *See* 8 U.S.C. § 1231(a)(6). To that end, the above-noted delay of Petitioner's release may serve another purpose: it will give immigration authorities an opportunity to develop reasonable conditions of supervision for Petitioner, and, if they so choose, to determine whether Petitioner

may be detained on some basis other than his noncompliance with his nonimmigrant status. The Court's order does not preclude Respondents from continuing to detain Petitioner on any other permissible basis provided under applicable statutes or regulations.[5]

## II. Petitioner's Second and Third Claims – Constitutional Violations

In his second and third claims, Petitioner argues that his continued detention violates his substantive due process rights and that the manner in which ICE has conducted his custody reviews violates his procedural due process rights. However, for both claims, Petitioner requests no more than release from detention subject to reasonable conditions of supervision. *See* ECF No. 3 at 8; ECF No. 29 at 40. Because Petitioner has been afforded complete relief by virtue of his first claim, the Court finds it unnecessary to address these alternative grounds. *See Banks v. Dretke*, 540 U.S. 668, 689 n.10 (2004) (where writ of habeas corpus was granted on one basis, declining to address alternative ground because "any relief [the petitioner] could obtain on that claim would be cumulative"); *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) (noting that courts should ordinarily avoid "reaching constitutional questions in advance of the necessity of deciding them").

## III. Proper Respondents

One final matter must be addressed. Respondents contend that all of the respondents except Jeffrey Searls should be dismissed from the action. They assert that the appropriate respondent in a habeas action is the person having custody over the petitioner—here, Jeffrey Searls, the Acting Assistant Field Office Director of the ICE Buffalo Field Office.

---

[5] In his reply brief, Petitioner argues that he is neither a risk to the community nor a flight risk. *See* ECF No. 29 at 37-40. The Court declines to address these questions at this juncture. Under § 1231(a)(6), immigration authorities are responsible for determining, in the first instance, whether an alien is "a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6). Moreover, because Petitioner is not presently being held on either of those bases, any opinion by this Court would be advisory.

14

"The majority view in the Second Circuit requires the 'immediate custodian,' generally the prison warden, to be named as a respondent in 'core' immigration habeas proceedings—*i.e.*, those challenging present physical confinement." *Khemlal v. Shanahan*, No. 14 Civ. 5186, 2014 WL 5020596, at *2 n.3 (S.D.N.Y. Oct. 8, 2014); *Zhen Yi Guo v. Napolitano*, No. 09 Civ. 3023, 2009 WL 2840400, at *3 (S.D.N.Y. Sept. 2, 2009) (collecting cases). Petitioner does not dispute that Searls is the only appropriate respondent under this rule. Therefore, the other respondents will be dismissed from the case, and the Court's order will be limited to Respondent Searls. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); *see also In re Grabis*, No. 13-10669, 2018 WL 1508754, at *5 (S.D.N.Y. Mar. 26, 2018) ("Relief under Rule 21 dismissing a party from an action is especially appropriate when there is clearly no right or basis of relief from a party." (internal quotation marks omitted)).

## CONCLUSION

For the reasons discussed above, the petition is GRANTED as follows:

1. Petitioner is entitled to relief insofar as the government has exceeded its authority to detain Petitioner under 8 U.S.C. §§ 1227(a)(1)(C) & 1231(a)(6);

2. Petitioner shall be released from Respondent Searls's custody on March 1, 2019, unless the Court orders otherwise;

3. Respondent Searls may file a supplemental memorandum on the status of negotiations with the unspecified country by January 28, 2019, after which the Court will determine whether to delay Petitioner's release;

4. Respondent Searls may, in his discretion, set reasonable conditions of supervision for Petitioner as part of his release;

5. The Court's order does not preclude Respondent Searls from continuing to detain Petitioner on any other permissible basis under applicable statutes and regulations;

6. Respondent Searls shall notify the Court if he determines that Petitioner will be detained on some other permissible basis.

7. The Clerk of Court shall dismiss all other respondents except Jeffrey Searls from this action.

IT IS SO ORDERED.

Dated: January 2, 2019
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court